IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 13, 2002

## STATE OF TENNESSEE v. KEVIN LANE FARRAR

**Direct Appeal from the Circuit Court for Bedford County**
**No. 14848     F. Lee Russell, Judge**

---

**No. M2001-01370-CCA-R3-CD - Filed April 16, 2002**

---

The defendant was convicted of reckless aggravated assault, a Class D felony, and sentenced as a standard, Range I offender to three years and six months in the Tennessee Department of Correction. Following the denial of his motion for a new trial, he filed a timely appeal to this court, raising three issues: (1) whether the trial court imposed an excessive sentence; (2) whether the trial court erred in allowing the State to impeach a defense witness with a prior misdemeanor conviction for failure to appear; and (3) whether the evidence was sufficient to support his conviction. Based upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Merrilyn Feirman, Nashville, Tennessee (on appeal); Donna L. Hargrove, District Public Defender; and Andrew Jackson Dearing, III, Assistant District Public Defender (at trial and on appeal), for the appellant, Kevin Lane Farrar.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William M. McCown, District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On January 18, 2001, the defendant, Kevin Lane Farrar, was indicted by the Bedford County Grand Jury on one count of aggravated criminal trespass and two counts of aggravated assault for cutting his cousin with a knife during a November 2, 2000, altercation in the parking lot of a Shelbyville business. The criminal trespass count was subsequently dismissed, and the defendant proceeded to trial on the two remaining counts of the indictment, charging him with aggravated assault causing serious bodily injury and aggravated assault with a deadly weapon.

The defendant's trial was held on April 9, 2001.  The State's first witness was the victim, James Farrar, Jr., who identified the defendant as his second cousin.  The victim testified that he was employed at Madison Street Tire, a Shelbyville business owned by his father.  At about 11 p.m. on November 2, 2000, he was driving home past the business when he noticed that several individuals had pulled into the parking lot to drink.  In addition to the defendant, the victim recognized his friend, Chad West, and his relatives, Eldie Farrar, Thomas ("Peanut") Farrar, Terry Wayne Farrar, and Steve Farrar.[1]  The victim testified that he pulled his pickup truck into the parking lot, got out, and said to the entire group, "You know you can't drink up here.  I wish you'd go somewhere else and do it."  At that point, he saw the defendant reach across West's truck to land a glancing blow on West's chin with his fist.  The victim testified that he thought at first that the men were playing.  When he realized that it was serious, he told the defendant, "Hey, you all take this somewhere else.  This ain't the place for it to be."  According to the victim, the defendant's response was to "lunge" at him.  He said that he grabbed the defendant on either side of his head and pushed him down to the ground.  As they went down toward the ground together, the victim felt "something up in [his] side[.]"  The victim testified that when he pulled the defendant's arm "out from inside [his] stomach," he saw a bloody knife, which looked like a pocketknife, in the defendant's hand, and realized that he had been cut.  As he let go of the defendant and got up to try to look at his wound, the defendant lunged at him again, this time cutting him on his left arm.  The victim testified that he did not do anything to provoke the attack, and that he did not see West do or say anything to provoke the defendant, either.  According to the victim, the entire incident happened very quickly, within the space of 45 to 50 seconds.  At the request of the State, the victim stood and raised his shirt, exhibiting to the jury the scarring that had been left from his wounds.

The victim acknowledged that he had had between six to eight "baby Buds" from about 6:00 until 8:30 or 9:00 p.m., but denied that he was drinking or had a beer in his hand when he stopped at the parking lot.  He also denied that he grabbed the defendant's neck in a choke hold, threatened the defendant or Terry Farrar or Eldie Farrar at the parking lot, or made any threats to anyone later in the evening, when West drove him from the hospital to the home of the defendant's parents, Roy and Peggy Farrar.  He said that no altercation occurred at the home.

Chad West testified that it was his habit to go to the parking lot each evening.  When he drove into the lot on the evening of November 2, 2000, approximately ten minutes before the victim arrived, the defendant, Eldie Farrar, Thomas Farrar, and Terry Wayne Farrar were already present.  He said that he had not argued with anyone present, and was standing silent at the back of his truck, when the defendant reached over and "nicked" him in the chin with his fist. At about the same time, the victim pulled his pickup truck into the parking lot.  The victim told the defendant to "take it somewhere else[,]" and the defendant lunged at the victim.  West said that the victim grabbed the defendant by the head and that the two "scuffled a little bit[,]" before going down to the ground.  When the victim got up, "he was cut."  He did not see the victim with anything in his hands, and did not see him fall onto any beer bottles.

---

[1]All of these men are apparently the victim's cousins, of one degree or another.

West acknowledged that he had been dating the defendant's sister, but denied having told anyone at the parking lot that he wanted "some pussy" from her. He said that both the victim's side and arm were cut when he got up from the ground. He did not see a knife or a beer bottle in the defendant's hands. He testified that he did not try to run anyone over as he drove the victim to the hospital, and that the victim did not threaten anyone at the parking lot or at the home of Roy and Peggy Farrar. He said that no one tried to separate the men. On redirect, he testified that the entire altercation happened too quickly for anyone to intervene.

Dr. Arthur Kent Clark, accepted by the court as an expert in the field of emergency medicine, testified that he was working in the emergency room of the Bedford County Hospital when the victim was brought in for treatment. Dr. Clark said that the victim's major injury was a ten-inch long, "gaping" laceration that started in his mid-back region and extended around into his left flank over his abdomen. He characterized the wound as "deep," stating that it went down to the depth of the victim's ribs, through two layers of muscle and through his interior abdominal wall. The injury appeared to "cut right to" and "then . . . hit the rib[,]" but it did not penetrate the victim's chest or abdominal cavities. Dr. Clark indicated, however, that the victim only narrowly missed having those cavities penetrated and the attendant risk of damage to his lung and spleen by the weapon's having hit his rib, rather than striking either above or below the rib. The victim's major wound was closed in three layers, with a total of 60 to 70 dissolving sutures placed in the layers of muscle and subcutaneous fat beneath the skin, and 65 to 70 staples placed in the skin. His second wound was a four- to five-inch superficial laceration across the deltoid area of his left upper arm, which was closed with skin closure bandages. The victim suffered a moderate loss of about a pint of blood from his injuries. The victim's blood-alcohol level, measured at 11:40 p.m., was "166 mg/dl. [milligrams per deciliter]" or about one and a half times the "legal limit for driving purposes."

Five witnesses testified on the defendant's behalf, all of whom were related, in one way or another, to both the defendant and the victim. Terry Wayne Farrar testified that he was riding in a car past the tire shop with the defendant, Eldie Farrar, Thomas Farrar, and Steve Farrar when Chad West, who was standing shirtless in the parking lot, "hollered" for them to stop. When they pulled into the lot, West, who had a beer in his hand and appeared to be intoxicated, "got up in [his] face" and started cursing him. The defendant asked West what his problem was, to which West replied that it was none of the defendant's business, and that the defendant should tell his sister that West wanted "some more pussy from her." The defendant told West that he should not be saying that, and West called the defendant a "bitch." The defendant reacted by hitting West in the lip. Next, the victim pulled up in his truck, and West told him that the defendant had hit him. The victim told West that he needed to "straighten [his] business[,]" but West just said, "No, fuck that bitch. I ain't got nothing else to say to him." West then turned to walk away. The defendant walked around the truck and hit West in the lip again, saying, "Do you still think I'm a bitch?" At that point, the victim grabbed the defendant by the throat and started hitting his head against the side of the truck, saying "I'm going to kill you off my lot. Do you understand me?"

The witness testified that the altercation lasted about twenty minutes, and that the victim refused to stop even as he and Eldie Farrar attempted to intervene. He said that the two men fell

down and stayed on the ground for "2 or 3 minutes, maybe" before he saw the victim get back up. The "next thing [he] kn[e]w," the victim ran out into the road and "fell out in the middle of the road backwards." He did not see anything in the defendant's hands, and did not see anyone with a knife. He testified that West tried to run them over as he drove himself and the victim from the parking lot, and that he later appeared with the victim at Roy and Peggy Farrar's house, where the victim, who was acting "crazy," told Roy and Peggy Farrar that he was going to kill their son because the "son of a bitch" had cut him.

The witness testified on cross-examination that the defendant knocked a beer bottle out of West's hands before he struck him in the lip, and that the defendant and the victim fell to the ground in the vicinity of the broken bottle. He estimated that the victim slammed the defendant's head into the side of the truck "[a]bout 10 or 12 times, maybe even more[,]" and testified that the victim threatened both him and Eldie Farrar when they attempted to break up the fight. He admitted that he had been convicted of theft of property over $1000 but under $10,000; felonious possession of marijuana; evading arrest; theft of property over $500 but less than $1000; and felony failure to appear.

Thomas Paul ("Peanut") Farrar testified that the altercation started with Chad West telling the defendant that he wanted "some pussy" from the defendant's sister. The defendant let West know that he took exception to the remark, and West called the defendant a "bitch." The defendant reacted by hitting West. Shortly thereafter, the victim arrived, and West told him that the defendant had hit him. Saying, "It's my parking lot," the victim ran up, grabbed the defendant from behind, and told him, "If you don't get out of my parking lot, I'll kill you." After that, the only thing that the witness could see was everyone running forward trying to break up the fight. He testified that he was present at Roy and Peggy Farrar's house later in the evening when the victim and Chad West arrived, and that he did not hear anyone make "what you call threats or nothing."

The witness began his cross-examination testimony by bragging that "[e]very day is a drinking day for me" and stating that he had already consumed two pints of whiskey that morning before court. Much of the rest of his testimony followed a similar vein, as the following exchange reveals:

> A   Well, to answer that question:  I only weigh about 179 pounds, and I can drink 4 cases of beer with myself, and I can kill 3 bottles, a fifth, by myself.
>
> . . . .
>
> Q   All right.  3 fifths of whiskey.  So we're not talking about pints anymore; we're talking about -- a fifth is a pretty good-sized bottle?
>
> A   I told you I drank 3 fifths of whiskey that day -- I mean any day.

Q   And then on top of that, possibly a case of beer?

A   No, about three or four cases.

Q   In a day?

A   Yes, sir. You buy it; I'll prove it.

Q   Well, we're not -- this is not a fraternity pledge party here –

A   Well, I'm just trying to tell you:  Don't put words in my mouth when I'm telling you the truth.

. . . .

Q   All right.  So you're saying it's possible for you in a given day to drink anywhere from 72 to 96 beers.  You could do it?

A   Ain't no problem.

Q   But you don't recall whether this was a 72- or a 96- beer day back on November 2nd?

A   It could have been 140.

Q   All right.  And, Mr. Farrar, I take it you have no problem overexaggerating [sic] things by any means?

A   No, sir.  You can check my record.  I've been to Buffalo Valley. I'm a full-blown alcoholic.  They say I was born that way, and I guess I'll die that way.

The witness later revised upward his estimate of the number of beers he had consumed on the day of the incident, stating that "[i]t might have been 184."[2]

Eldie and Steve Farrar's accounts of the incident were essentially similar to that offered by Terry Wayne Farrar.  Both men testified that Chad West flagged down their car and then made the

---

[2]At the conclusion of this witness's testimony, in an exchange that occurred outside the jury's presence, the trial court ordered that the witness be taken for a Breathalyzer test to determine his level of intoxication, and defense counsel apologized to the court for having unknowingly placed an inebriated witness on the stand.  After the jury had returned their verdicts, the trial court informed them that the witness had been given a Breathalyzer test, which revealed a blood-alcohol level of .14% and that the court would be holding a contempt hearing on him the following day.

vulgar remark about the defendant's sister, which provoked the defendant into slapping the beer bottle out of his hand and hitting him in the face. They testified that the victim drove up in time to witness the defendant hit West a second time, and that he reacted by grabbing the defendant by the neck. Eldie Farrar testified that the victim "punch[ed]" the defendant "two or three times" in the back of the head, and that when he tried to intervene, the victim told him to "get out of his face" or he would kill him. Steve Farrar testified that the victim slammed the defendant's head into the truck, and that he heard him threaten to beat Eldie and Terry Wayne "off the lot" when they attempted to intervene in the fight. Steve Farrar was unable to say how many times the victim beat the defendant's head into the truck, and neither man testified regarding how long the fight lasted. Both testified that the victim had let go of the defendant and was either walking away or backing up when he fell backwards to the ground in the vicinity of the broken beer bottle. Steve Farrar testified that the victim "fell backwards because he was drunk[,]" and Eldie Farrar testified that he never saw the defendant fall to the ground with the victim. Neither man saw a knife nor the defendant lunge at the victim. Both testified that the intoxicated victim later showed up at Roy and Peggy Farrar's house in a belligerent mood. Eldie Farrar admitted on cross-examination that he had been convicted of failure to appear.

The defendant's final witness was his mother, Peggy Farrar, who testified that she was at home in the early morning hours of November 3, 2000, when she heard a truck pull up and a "loud ruckus." Going outside, she saw the victim "all up in [her] husband's face cussing and carrying on." Her husband went inside, and she told the victim to leave. He replied that he "didn't have to," and continued "rambling on and on pretty much threatening everybody." At one point, he came toward her, "[s]ort of in a threatening manner," and she turned around, went inside, and called 911. Mrs. Farrar testified that the defendant had several knots on his head, a red bruise on his cheek, and a busted lip from his encounter with the victim.

After deliberating, the jury found the defendant guilty of reckless aggravated assault resulting in serious bodily injury and reckless aggravated assault with a deadly weapon. The trial court merged the two counts into a single conviction for reckless aggravated assault resulting in serious bodily injury, a Class D felony, and sentenced the defendant to three years and six months in the Department of Correction. Thereafter, the defendant filed a timely notice of appeal to this court.

## ANALYSIS

### I. Sentencing

As his first issue, the defendant contends that the trial court imposed an excessive sentence. He argues that the court failed to consider or apply appropriate mitigating factors, including evidence that he was provoked, that he is a good worker, and that he had not used drugs or alcohol, except on the night of the incident, for the previous two years. The State argues that the trial court did not abuse its discretion in sentencing the defendant to three years and six months.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103 and -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. Since the record in this case demonstrates that the trial court considered all relevant facts and circumstances and followed the principles of the 1989 Sentencing Act, our review of this issue is *de novo* with a presumption of correctness given to the trial court's sentencing determinations.

The defendant was the only witness to testify at his sentencing hearing. He said that he was 28 years old, married, and the father of two children – a nine-year-old by his first wife and an eighteen-month-old daughter by his current wife. He had been employed at the time of his arrest at Lockwood Construction Company in Franklin, Tennessee. Prior to that job, he had worked for Sterling Construction Company in McMinnville, and the owner had offered to hire him again if he was released from prison. The defendant testified that he had been drinking on the evening of the incident and that he had taken "offense," as he assumed "anybody would," to the degrading comments made about his sister. Although he maintained he was innocent of the offenses, testifying on cross-examination that he knew he had not cut the victim because he did not carry a weapon, the defendant acknowledged that he had made a mistake by becoming drunk that evening. He stated that he had a history of drug and alcohol abuse, but had not used either for the two years preceding the incident. However, on the night in question, he had given in to feelings of discouragement caused by "complications" with his ex-wife over back child support he owed and "just . . . threw up [his] hands and said, I am through with it. I'm going to get drunk." He said that he had learned his lesson about drinking.

The defendant's lengthy criminal record contained only one adult felony conviction, for an aggravated robbery committed at the age of 20. The trial court therefore appropriately classified him as a standard, Range I offender. As a standard offender convicted of a Class D felony, he was subject to a sentence ranging from not less than two to not more than four years. See Tenn. Code Ann. § 40-35-112(a)(4) (1997). The sentence to be imposed by the trial court for a Class D felony

is presumptively the minimum sentence in the range when no enhancement or mitigating factors are present. See id. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range as appropriate based on the presence of any applicable enhancement factors, and then reduce the sentence as appropriate based on the presence of any mitigating factors. Id. § 40-35-210(e). The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion as long as the trial court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. Id. § 40-35-210 (1997), Sentencing Commission Cmts.; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

The trial court found four enhancement factors applicable to the defendant's case: the defendant's previous history of criminal convictions or criminal behavior in addition to those necessary to establish his range; the defendant's history of unwillingness to comply with the conditions of a sentence involving release into the community; the offense was committed while the defendant was out on parole for a previous felony conviction; and the defendant was adjudicated to have committed delinquent acts as a juvenile that would have constituted felonies if committed by an adult. See Tenn. Code Ann. § 40-35-114(1), (8), (13), and (20) (1997). Although the defendant does not challenge the enhancement factors on appeal, we note that the record fully supports the application of these factors and the weight the trial court assigned to them. The defendant's record of prior arrests and convictions, which covers over seven pages in his presentence report, reveals a substantial history of criminal conduct, beginning with his convictions for grand larceny and second degree burglary at the age of 12, and including his adult felony conviction for aggravated robbery, for which he received a sentence of ten years and for which he was out on parole at the time of the instant offense.

At his sentencing hearing, the defendant proposed as mitigating factors that he acted under strong provocation; that substantial grounds existed to excuse his conduct, in that he was under the influence of alcohol at the time; and that he had a good work history. See Tenn. Code Ann. § 40-35-113(2), (3), and (13) (1997). The trial court considered, and rejected, each of these proposed mitigating factors:

> As far as the mitigating factors, I do not find that there was strong provocation. It's speculation in this case to say that he was provoked by a remark about his sister. Number one, that remark was not made by the victim in this case. And number two, the Defendant has never told us that that is what provoked him because he insists that he did not do that. So, I don't think that's present here.
>
> I fail to see that, in this particular case, the fact that he was inebriated is a mitigating factor here. And I don't find that it is one here. As far as his work record being a mitigating factor, he has worked some. He's been in jail a lot. I don't find that to be a mitigating factor. So, on the enhancement – and I should have said this a minute ago. On the enhancement the presumption begins at 2

years. And I enhance him up to 3 years and 6 months. I don't find
a mitigating factor to bring that back down.

Our review reveals no abuse of discretion by the trial court in its sentencing determinations in this case. We agree with the trial court that the defendant's intoxication does not excuse his behavior, and that there was nothing in the facts of this case to warrant a finding that the defendant acted under strong provocation when he cut the victim. On appeal, the defendant argues that the trial court should have given some weight in mitigation to the fact that his two most recent employers both described him as a "hard worker." However, according to his presentence report, he worked only a little over two months and five months, respectively, at these two most recent jobs. There are only two other jobs listed on his report, one of which lasted about fourteen months and the other about five months. In between these latter two jobs is a two-year gap in employment, which, as far as we have been able to determine, does not correspond to any of the defendant's periods of confinement. We hardly think this qualifies as a good work history. We therefore find no abuse of discretion by the trial court in failing to consider the defendant's work history, or his two most recent employers' praise of his work habits, as a factor in mitigation.

The defendant also argues that the trial court should have found his testimony that he had remained sober for the two years prior to the offense as a mitigating factor. We disagree. We note first that the only evidence the defendant presented in support of this claim was his own testimony. However, even if the defendant's claim is true, we can find no abuse of discretion by the trial court in failing to apply it as a factor in mitigation, especially given the defendant's testimony that he had become discouraged on the night of the incident, thrown up his hands, and made the conscious decision to go out and get drunk.

In sum, the record supports the trial court's finding that there were four enhancement, and no mitigating, factors applicable to the defendant's case. We therefore conclude that the trial court did not err in enhancing the defendant's sentence from the presumptive minimum sentence to a sentence of three years and six months.

## II. Impeachment of Defense Witness with Misdemeanor Conviction for Failure to Appear

Next, the defendant contends that the trial court erred by allowing the State to impeach Eldie Farrar with his prior misdemeanor conviction for failure to appear, arguing that failure to appear is not a crime involving dishonesty or false statement. The State contends that failure to appear is, by its very nature, a crime of dishonesty. The State further argues that even if it is not a crime involving dishonesty, any error that may have been caused by impeaching the witness with the offense was harmless, given the insignificant portion of the trial the impeachment occupied, and the fact that a number of other defense witnesses offered testimony that was essentially similar to that given by the witness.

This issue is governed by Tennessee Rule of Evidence 609(a), which provides that, if certain procedures are satisfied, a witness's credibility may be impeached with evidence of a misdemeanor

conviction if the crime was one which involved dishonesty or false statement. If the witness being impeached is not the accused, "Rule 403 applies, and a conviction would be admissible to impeach unless 'its probative value is substantially outweighed by the danger of unfair prejudice' or other criteria listed in that rule." Tenn. R. Evid. 609, Advisory Commission Cmts. When the trial court has acted within the confines of Rule 609, its decision to permit impeachment by use of a prior conviction will not be overturned on appeal absent an abuse of discretion. State v. Sheffield, 676 S.W.2d 542, 549 (Tenn. 1984); State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996). Since the trial court acted within the confines of Rule 609, we review its decision under an abuse of discretion standard.

During the State's cross-examination of Eldie Farrar, the court held a conference outside the hearing of the jury to determine which of the witness's misdemeanor convictions, if any, the State would be allowed to use to impeach his credibility. The State agreed that most of the witness's convictions could not be used, but argued that his conviction for failure to appear, along with the fact that he was currently in jail on a charge of probation violation, should be allowed as probative of the witness's credibility. The trial court ruled that the State would be allowed to impeach the witness only with the failure to appear conviction, finding that it was probative of the witness's credibility, and that the probative value of the conviction was not outweighed by its prejudicial effect. Thereafter, the following exchange occurred between the State and the witness:

> Q Now, you are the same Eldie Farrar who was convicted in Bedford County General Sessions Court on December 14th of the year 2000 of the crime of failure to appear in court?
>
> A No, sir. I was failure to appear going to jail. I was late getting to jail.
>
> Q All right.
>
> A And now if you're late reporting into jail, they charge you for failure to appear.
>
> Q You were convicted; all right. You are the same Eldie Farrar convicted in Bedford County General Sessions Court on December 14th of the year 2000 of the crime of failure to appear?
>
> A Right, I reckon so.
>
> MR. RANDLES: No further questions.

The State argues that failure to appear is a crime involving dishonesty because, to have been convicted of the offense, the individual must have "knowingly failed to appear," and been without a reasonable excuse. See Tenn. Code Ann. § 39-16-609 (1997 & Supp. 2001). The trial court

apparently accepted the State's argument, finding that the conviction had a bearing on the truthfulness of the witness. We disagree. Failure to appear is not in the same class of offenses, considered probative of truthfulness, which our courts have previously held to be crimes involving dishonesty. See Neil P. Cohen et al., Tennessee Law of Evidence § 6.09[4][b] (4th ed. 2000) (". . . crimes involving dishonesty include robbery, larceny from the person, transporting a stolen vehicle in interstate commerce, shoplifting, burglary, grand larceny, petit larceny, theft, stealing, concealing stolen property, . . ."); see also State v. Leon Hurd, No. E1999-01341-CCA-R3-CD, 2001 Crim. App. LEXIS 262, at *40 (Tenn. Crim. App. Apr. 10, 2001) (noting that misdemeanor crimes admissible to impeach a witness's credibility usually fall into the theft category). Nonetheless, we agree with the State that the trial court's error in admitting the conviction was harmless, in light of the relatively minor portion of the witness's testimony that the impeachment occupied, and the fact that his essential testimony, indicating that it was the victim who attacked the defendant, was corroborated by three other defense witnesses, including one who was neither intoxicated when he took the stand, nor impeached with evidence of prior convictions.

### III.  Sufficiency of the Evidence

As his final issue, the defendant contends that the evidence was insufficient, as a matter of law, to sustain his conviction for aggravated assault. When the sufficiency of the evidence is raised as an issue on appeal, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of reckless aggravated assault. To convict for this offense, the State must prove beyond a reasonable doubt that the defendant either recklessly committed an assault causing serious bodily injury to another, or recklessly committed an assault using or displaying a deadly weapon and causing bodily injury. See Tenn. Code Ann. §§ 39-13-101(a)(1), -102(a)(2) (1997). The jury returned guilty verdicts on both counts of the indictment, finding the defendant guilty of reckless aggravated assault resulting in serious bodily injury and reckless aggravated assault by the use of a deadly weapon. However, the trial court merged the two counts into a conviction for

reckless aggravated assault causing serious bodily injury. The defendant did not object to this merger.

The defendant contends that the evidence was insufficient to support his conviction because none of the witnesses, with the exception of the victim, saw him with a knife. Asserting that "[i]n the course of this fight, it would have been impossible for the victim to have seen the knife[,]" he argues that the victim's testimony about the knife should not have been credited. He makes no argument on the issue of whether the victim sustained serious bodily injury in the assault. However, the conviction being appealed is reckless aggravated assault causing serious bodily injury.

The evidence clearly was sufficient to support the jury's finding that the victim sustained serious bodily injury in the attack. Serious bodily injury includes a "cut" that involves a substantial risk of death, or protracted or obvious disfigurement. See Tenn. Code Ann. § 39-11-106(a)(2), (34)(A) & (D) (1997). The proof established that the victim sustained a major laceration to his torso which extended over ten inches in length; penetrated his interior abdominal wall and three layers of skin, muscle, and fat, narrowly missing his lung and/or spleen; required over 120 stitches and staples to close; and resulted in a permanent scar. The distinction between bodily injury and serious bodily injury is generally a question of fact for the jury to determine. See State v. Barnes, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997). Dr. Clark testified that the wound was "large [and] deep," and, at one point, he "had both [his] hands fully inside the wound." We conclude, therefore, that the evidence was more than sufficient to support the jury's verdict finding the defendant guilty of reckless aggravated assault causing serious bodily injury.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-12-